UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRAD THOMPSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Judge Rebecca Pallmeyer |
| ) | |
| TIMOTHY J. HOULIHAN, ENNIO E. MORENO ) | No. 09 C 2914 |
| and THE COOK COUNTY SHERIFF'S ) | |
| OFFICE, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

On May 25, 2007, Defendants Timothy J. Houlihan, Ennio E. Moreno, and two of their fellow officers attempted to execute an eviction order at the home of Plaintiff Brad Thompson. Things did not go well, and the encounter ended with Thompson arrested and charged with resisting arrest and obstructing a police officer. Thompson has filed this suit under 42 U.S.C. § 1983 against Houlihan, Moreno, and the Sheriff of Cook County, Thomas Dart, alleging that Houlihan and Moreno used excessive force and falsely arrested him in violation of his constitutional rights. Defendants have moved for summary judgment. They argue that Plaintiff's § 1983 claim is barred by a release that Plaintiff signed in exchange for dismissal of the criminal charge against him, and that the claim fails on its merits because the officers had a reasonable basis to arrest the Plaintiff.

For the reasons explained here, Defendants' motion for summary judgment is granted.

## FACTUAL BACKGROUND

As this case is before the court on Defendants' motion for summary judgment, the court views the facts and draws all reasonable inferences that flow from them in the light most favorable to Plaintiff, the nonmoving party. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

**I. The Incident**

On May 25, 2007, Houlihan and Moreno, Cook County Sheriff's Police Officers assigned

to the warrants and evictions unit, were assigned along with two of their fellow officers to execute an order of possession for the house at 3430 West Evergreen. (Defendants' Statement of Material, Uncontested Facts (hereinafter, "Defs.' 56.1") ¶¶ 9, 10.) The front entry of the house is concealed within an enclosed front porch that has windows on three sides and a wooden door that opens onto stairs leading from the porch to the sidewalk. (*Id.* ¶ 5.)

Plaintiff Thompson is a 31-year old high school graduate who has taken some college classes. On May 25, 2007, Thompson, a sergeant in the U.S. Army, was on leave to visit his family who resided in the house. (*Id.* ¶ 7.) He arrived at the residence at approximately 8:00 a.m. that morning. (Thompson Dep. 10:22-23.) Approximately ten minutes later, Thompson learned that several people who appeared to be sheriffs had arrived in front of the residence. (*Id.* at 13:17-21.) Thompson knew at the time that the property had been subject to foreclosure proceedings, but was unaware of the details of those proceedings because they were being managed by his brother Victor. (*Id.* at 20:16-23.) Upon learning of the officers' presence, Thompson called Victor, who told Thompson that an appeal had been filed and that the eviction had been stayed. (*Id.* at 14:18-19; 20:24-21:11.)

While Thompson was on the phone, Defendants Houlihan, Morena, and another officer approached the house with an eviction order signed and approved by a representative of the company that held title to the property. (Defs' 56.1 ¶ 11; Thompson Dep. 17:10-13, 21:15-24.) The officers knocked on the door several times, and upon receiving no answer, forced entry into the enclosed porch. (Defs.' 56.1 ¶¶ 14, 15.) When Thompson heard the officers forcing the door of the porch open, he ended his phone call, stepped out to the porch, and positioned himself to block the officers from entering the home through the front door. (*Id.* ¶ 17.) Angry about the damage to the porch door, Thompson began screaming at the officers. (*Id.* ¶ 19.) Officer Moreno asked Thompson to calm down and explained that the bank now owned the house. (*Id.* ¶ 20.) Thompson did calm down, but he refused to allow the officers to enter, accused them of trespassing,

2

demanded to see paperwork authorizing the eviction, and advised the officers that his brother had filed an appeal from the foreclosure, with the result that the eviction must be stayed. (*Id.* ¶¶ 21, 22.)

After approximately ten minutes, Moreno produced a set of handcuffs and warned that he would have to arrest Thompson. (*Id.* ¶ 24.) At this point, Houlihan rushed toward Thompson and pushed him, startling Thompson and prompting him to pull his arm away. (*Id.* ¶ 25; Plaintiff's Statement of Additional Facts (hereinafter, "Pl.'s 56.1") ¶ 6.) Moreno then cuffed Thompson's right hand, announcing that Thompson was under arrest. (Defs.' 56.1 ¶ 29.) Once Moreno had restrained Thompson's right hand, Houlihan pushed Thompson and attempted to restrain his left arm. (Thompson Dep. 45:18-46:9.) Thompson claims that his sudden action startled him, prompting him to pull his arm from Houlihan's grasp. (*Id.* at 48:3-4.) In the course of the arrest, the officers pushed Thompson into a flimsy plastic table, which broke, causing Thompson and the officers to fall to the floor. (Defs.' 56.1 ¶¶ 30-31.) Thompson screamed at the officers, who picked him up and pressed him against a large window to finish attaching handcuffs. (*Id.* ¶ 31.) As Moreno gripped Thompson's right wrist, and Houlihan pulled his left wrist down toward the handcuffs, the window shattered and both Thompson and Houlihan fell through the window to the porch. (*Id.* ¶¶ 33, 35.) Thompson suffered a series of cuts on his arms which required approximately 52 stitches. (*Id.* ¶ 38.) Thompson was charged with resisting arrest and obstructing a police officer, and was released on bond that evening. (*Id.* ¶ 40; Thompson Dep. 79:20-22.)

## II.    **The General Release**

Thompson retained attorney Robert Aronson to represent him on the criminal charges. Aronson, a veteran criminal defense attorney, has often been successful in negotiating for dismissal of charges when he deems this in his client's best interests. (Defs.' 56.1 ¶ 43; Plaintiff's Conceded Facts that are Undisputed and Material ¶ 43.) Without any advance discussion with Thompson, Aronson approached the Assistant State's Attorney ("ASA") to propose a dismissal of the criminal

case against Thompson in return for Thompson's agreement to release any claims he might make arising from the incident. (*Id.* ¶¶ 44-45; Thompson Dep. 20:15-17.) The ASA agreed. (Defs.' 56.1 ¶ 46.)

On September 10, 2007, Aronson and Thompson met in a small room in the back of the courtroom where Thompson was scheduled to appear later that day. (Thompson Dep. 19:1.) Aronson and Thompson were alone in the room. (*Id.* at 19:5-6.) In Thompson's presence, Aronson prepared a handwritten document entitled "General Release" which reads in full as follows:

> GENERAL RELEASE For $10.00 and other good and valuable consideration I, Brad Thompson, hereby release all deputy sheriffs, the sheriff's department and all their agents, servants and employees of and from all civil liability for all injuries sustained by me on May 25, 2007, in the incident at 3430 West Evergreen, Chicago, Cook County Illinois. Signed this 10th day of September, 2007.

(Defs.' 56.1 ¶¶ 46, 48.) Both parties agree that "[o]ther good and valuable consideration" was the dismissal of the criminal case. (Plaintiff's Conceded Facts that are Undisputed and Material ¶ 50.)

When Aronson finished drafting the handwritten release, he presented it to Thompson and told him to sign it. (*Id.* ¶ 53.) Aronson did not otherwise explain the agreement; he did not tell Thompson that the document would release the officers of liability, and he did not tell Thompson that his criminal case would be dismissed if he signed it. (*Id.* ¶ 49.) As Thompson began to read the agreement, Aronson screamed at Thompson, ordering that he sign it. (*Id.* ¶ 53.) Intimidated, but believing that Aronson was acting in his best interest, Thompson signed the release without reading beyond the heading "General Release." (*Id.* ¶¶ 53-54; Pl.'s 56.1 ¶ 18.) Thompson followed his signature by writing "UCC 1-308 All Rights Reserved Without Prejudice." (Defs.' 56.1 ¶ 55.) Thompson explained at his deposition he often signs documents (including, for example, his driver's license), when he does not understand them. (Thompson Dep. 26:18-21.) In this instance, Thompson claims he added the UCC language because he was not given a chance to read the document before he signed it. (Pl.'s 56.1 ¶ 17.) Thompson claims he believed that he was not giving up any rights by signing the agreement. (*Id.* ¶ 15.)

4

After Thompson signed the release, the ASA entered the room and Aronson gave him the release. (Defs.' 56.1 ¶ 56.) Thompson himself did not discuss the release-dismissal agreement with the Assistant State's Attorney or anyone else serving in a prosecutorial function, and he was surprised when his criminal case was dismissed moments after Aronson handed over the release. (*Id.* ¶ 57; Pl.'s 56.1 ¶ 19.)

On May 13, 2009 Thompson filed this § 1983 complaint, naming Timothy Houlihan, Ennio Moreno, and Thomas Dart, Sheriff of Cook County as Defendants. (Defs.' 56.1 ¶ 2.) Defendants contend that the release signed by Thompson is valid and bars this lawsuit. As explained here, the court agrees.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). In considering a motion for summary judgment, the court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. *Petts v. Rockledge Furniture, LLC*, 534 F.3d 715, 720 (7th Cir. 2008).

### II.   Validity of the Release

Plaintiff has made two arguments against enforcement of the release: first, he contends the release-dismissal agreement is unenforceable because it is contradictory on its face, and second, that its enforcement would violate public policy. As explained below, neither argument is persuasive.

#### A.  The release-dismissal agreement is facially valid.

Thompson argues that when he wrote the words "UCC 1-308 All Rights Reserved Without Prejudice" beneath his signature, he was expressly reserving the right to bring this suit. The UCC reference is plainly inapplicable to this dispute, however, and the language Thompson added to his

signature is ineffective to defeat the plain terms of the parties' agreement.

Illinois contract law adheres to the "four corners" rule, under which "[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined by the language used. It is not to be changed by extrinsic evidence." *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 993 (7th Cir. 2007). Absent any ambiguity in the contract, the parties' intent must be determined from the writing itself. *See, e.g.*, *Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 288 (1998). "Although words should be given their ordinary and accepted meaning, they must be viewed in context, and the contract must be considered as a whole in order to ascertain the parties' intent." *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (citing *Trade Ctr. v. Dominick's Finer Foods*, 304 Ill. App. 3d 931, 934, 711 N.E.2d 333, 335 (1st Dist. 1999)). The meaning of particular contract terms are interpreted in the context of the agreement as a whole as well as in their own context. *AA Sales & Assocs., Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 610 (7th Cir. 2008).

Thompson's reference to § 1-308 of the UCC has no obvious relationship to the terms of the release he signed, which is not otherwise governed by the Uniform Commercial Code. Courts are hesitant to apply the UCC outside of the commercial context. *See, e.g.*, *DiMario v. Coppola*, 10 F. Supp. 2d 213, 233 (E.D.N.Y. 1998) (UCC does not apply to employment contracts). Article 1 of the UCC applies to a transaction only to the extent that it is governed by another article of the Uniform Commercial Code, UCC § 1-102, and does not apply to a transaction such as this one, involving the release of civil rights claims in return for dismissal of criminal charges. Section 1-308 was intended to enable a party in a commercial transaction to accept the other side's continued performance without waiving the right to sue for breach of contract. U.C.C. § 1-308, cmt. 1 (2011); 810 ILCS 5/1-308. There were no goods being purchased or sold between Thompson and Cook County, nor any pre-existing contract for the parties to perform during the resolution of a dispute.

What was proposed, instead, was a new agreement in which Thompson waived his right to sue the officers in exchange for the dismissal of pending criminal charges. This was an explicit waiver of a claim for liability, not the type of undesired waiver that § 1-308 was intended to guard against. Allusions to the UCC have no legal effect on the release that Thompson signed.

In addition to his reference to § 1-308, however, Thompson added the words "All Rights Reserved Without Prejudice"; he argues that this language must be understood independently as creating a direct conflict with the text of the agreement. The court is not persuaded. Whatever Thompson claims to have meant, his general reservation of unspecified rights does not create an ambiguity in the specific language drafted by his lawyer. Because the contract as written is unambiguous, the court will not consider extrinsic evidence of Thompson's intent. There is no question of material fact regarding the facial validity of the release-dismissal agreement.

### B. The release-dismissal agreement is not barred by public policy.

In the alternative, Thompson argues that enforcement of his release of federal civil rights claims would be inconsistent with public policy. Federal law governs the question policy considerations may render a waiver unenforceable. *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987). In *Rumery*, the Supreme Court held that agreements releasing civil claims in exchange for the dismissal of criminal charges are not *per se* invalid, but rather should be examined on a case-by-case basis to determine that the agreement was "voluntary, that there [was] no evidence of prosecutorial misconduct, and that enforcement of this agreement would not adversely affect the relevant public interests." *Id.* at 398. *Rumery* itself involved an agreement in which Rumery, who was charged with witness tampering, released town officials from liability arising from his arrest on witness tampering charges. *Id.* at 389-90. When Rumery later brought suit under § 1983 for false arrest and imprisonment, he argued that the agreement he signed was *per se* invalid. *Id.* at 391. In rejecting that argument and upholding the release, the Court noted that Rumery was a sophisticated businessman, was represented by an experienced criminal lawyer who drafted the

release-dismissal agreement, and obtained a concrete benefit, namely immunity from criminal prosecution. *Id.* at 394. These factors tended to show that the agreement entered into by Rumery was no more involuntary than those that are permitted in similar contexts such as plea bargaining. *Id.* at 393. The considerations identified as relevant by the *Rumery* court—voluntariness of the agreement, prosecutor conduct, and the public interest—all weigh in favor of enforcement of the agreement, as explained here.

### 1. The release-dismissal agreement was voluntary.

Defendants, who seek to enforce the release, bear the burden of establishing that Thompson entered into it voluntarily. *Id.* at 399. Several factors are relevant to that issue:

> Many factors may bear on whether a release was voluntary and not the product of overreaching, some of which readily come to mind. The knowledge and experience of the criminal defendant and the circumstances of the execution of the release, including, importantly, whether the defendant was counseled, are clearly relevant. The nature of the criminal charges that are pending is also important, for the greater the charge, the greater the coercive effect.

*Gonzales v. Kokot*, 314 F.3d 311, 317-18 (7th Cir. 2002) (citing *Rumery*, 480 U.S. at 401-02) (O'Connor, J., concurring). In *Rumery*, as noted, the Supreme Court relied on the fact that the plaintiff was a "sophisticated businessman," that he was not imprisoned when he signed the release, that he was counseled by an experienced attorney, and that the benefits he received from signing the agreement were obvious. *Rumery*, 480 U.S. at 394. In *Gonzales*, where plaintiff had been charged with disorderly conduct and resisting arrest, the Seventh Circuit upheld his release of claims in return for dismissal in light of the facts that plaintiff's former defense attorney had actively bargained for the dismissal of charges and was present with plaintiff when he signed the release. *Gonzales*, 314 F.3d at 319.

In the case before this court, Plaintiff Thompson, a military officer, has graduated from high school and taken some college courses. The release itself is less than a page long and is couched in simple language, which Thompson could have read and understood. Thompson was not in

8

custody when he signed the agreement, and the charges against him were only misdemeanors. In addition, Thompson was being represented by a veteran criminal defense attorney. All of these factors weigh in favor of enforcement of the agreement.

In challenging the voluntariness of the release, Thompson focuses on the conduct of his own attorney, Robert Aronson. He asserts that Aronson did not explain the agreement to him and pressured him to sign it without reading it. The plaintiff in *Berry v. Peterson*, 887 F.2d 635, 640 (5th Cir. 1989), made similar arguments. Berry was being held without bond on felony charges, including arson, when his mattress caught fire, resulting injuries. *Id.* at 636. When Berry filed suit to recover for his injuries, the County offered a settlement that included payment for medical expenses, a reduction of the arson charge to destruction of public property, and a recommendation that Berry receive probation on the other four felonies. *Id.* at 638. Berry's attorney discussed the proposal with other attorneys and possibly with Berry's own family members, but Berry himself claimed not to have known that by signing it he would lose his ability to sue the County for his injuries. *Id.* at 638-39. The court nevertheless declined to invalidate the release-dismissal agreement based on the lack of understanding or knowledge of the plaintiff, noting the presumption that a competent criminal defense attorney's advice and knowledge are binding. *Id.* at 640.

Cases in the Seventh Circuit are consistent with this approach. *Baptist v. City of Kankakee*, 481 F.3d 485 (7th Cir. 2007), addressed the enforceability of a release of employment discrimination claims. In *Baptist*, five African-American employees of the Kankakee Police Department claimed that the Department had engaged in discriminatory promotion policies in violation of 42 U.S.C. § 1983 and Title VII of the Civil Rights Act. They signed a settlement agreement on the advice of counsel, but acquired new counsel and moved to alter or amend the judgment, arguing that the settlement was "manifestly unfair," and that prior counsel did not properly explain the agreement and had persuaded them to enter into a settlement that was not in their best interests. *Id.* at 489. In that case, the Seventh Circuit followed the established rule for Title VII

cases that "where plaintiff is represented by chosen counsel throughout negotiations and settlement [ ] . . . [the settlement agreement] is presumptively informed and willing, absent circumstances such as fraud or duress." *Id.* at 490 (quoting *Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 373 (7th Cir. 1989)).

Plaintiffs' challenge to their attorney's conduct did not concern the court,,which noted that "the adequacy or propriety of counsel's advice is irrelevant to the question of whether a settlement was knowing and voluntary." *Id* (citing *Riley*, 881 F.2d at 374; *Taylor v. Gordon Flesch Co.*, 793 F.2d 858, 863-64 (7th Cir. 1986)). To the extent that plaintiffs suggested their attorney was guilty of using fraud and duress to get them to agree with the settlement, the court noted that a claim of fraud or duress sufficient to invalidate an agreement would have to be brought against an opposing party or a fellow party to a contract, not against a party's own attorney. *Id.* at 491 n.2. The court observed that plaintiffs were free to sue their own lawyer if his advice amounted to malpractice, but "keeping [a] suit alive merely because [a] plaintiff should not be penalized for the omissions of his own attorney would be visiting the sins of [the] plaintiff's lawyer upon the defendant." *Id.* at 49 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 n.10 (1962)).

Under Thompson's version of events in this case, he did not act voluntarily when he signed the release because Attorney Aronson intimidated him and failed to explain the document. He makes no suggestion that the agreement was the product of fraud or duress on the part of the prosecutor or any of the defendants, however. Duress alleged imposed by Thompson's attorney does not render the release involuntary in the sense contemplated by *Rumery*.

Plaintiff attempts to distinguish this case on the basis that Thompson added the UCC reference to the release in order to make clear did not intend to release any rights. The *Berry* court noted that the plaintiff had not expressed any unwillingness to enter into the release-dismissal agreement. *Berry*, 887 F.2d at 639. This factor was but one of six that the court considered, however, and it offered no guidance as to how dispositive this concern should be. *See id.* at

639-40.  For the reasons explained earlier, however, Thompson's reference to the UCC and general reservation of rights does not defeat the plain meaning of the more specific release language.  He has not presented any evidence that the ASA or Defendants must have understood his agreement was not voluntary.

### 2. There was no prosecutorial misconduct.

The second factor identified by the *Rumery* court as relevant to the enforceability of a release-dismissal agreement focuses on the prosecutor's conduct.  In negotiating a deal like this one, the prosecutor must have an independent, legitimate reason directly related to his prosecutorial responsibilities.  *Gonzalez*, 314 F.3d at 319.  The Seventh Circuit has explained that assessment of the prosecutor's conduct entails consideration of the prosecutor's action in charging the plaintiff in the first place and the prosecutor's duty to enforce the criminal law uniformly.  *Id.*

The first prong of this test is satisfied if the state's evidence was sufficient to send the case to a trier of fact, and the charges were not "unfounded criminal charges used as bargaining chips to cover up police misconduct."  *Id.* at 320 (quoting *Burke v. Johnson*, 167 F.3d 276, 286 (6th Cir. 1999)).  Here, there is nothing to suggest that the charges Plaintiff was facing were "bargaining chips."  Thompson's charges of resisting arrest and obstructing a police officer arose out of a conflict that occurred when the officers were attempting to enforce an order of possession.  It is undisputed that when the officers attempted to arrest him, he did move his arm away from them, and disputes about whether his resistance went beyond this.  The Illinois unlawful arrest statute provides that it is illegal to resist any authorized act of the police, 720 ILCS 5/31-1, and for purposes of this law, an unlawful arrest is considered an authorized act.  *See People v. Wareberg*, 44 Ill. App. 3d 78, 82, 358 N.E.2d 54, 57 (1st Dist. 1976).  There is no evidence that ASA assigned to Thompson's case had any concern about the officers' liability, nor did the ASA propose the release-dismissal agreement.  To the contrary, it is undisputed that it was Aronson, not the prosecutor, who proposed the deal, and that the prosecutor dismissed the charges only reluctantly.  The court sees

11

no dispute of fact concerning the prosecutor's having overreached his authority.

The second prong is satisfied if the prosecutor did not abandon his or her duty to uniformly enforce the criminal law. As the Court explained in *Rumery*, the decision whether to prosecute is "rarely simple," and is granted deference. *Rumery*, 480 U.S. at 396. Prosecutors must consider a number of factors, including the strength and importance of a particular case, government enforcement priorities, and the appropriate allocation of prosecutorial resources. *Id.* In her concurring opinion in *Rumery*, Justice O'Connor noted that "[s]paring the local community the expense of litigation associated with some minor crimes for which there is little or no public interest in prosecution may be a legitimate objective of a release-dismissal agreement." *Id.* at 399-400. Thompson was charged with two misdemeanors, resisting arresting and obstructing a police officer–charges similar to those at issue in *Gonzales*, where the Seventh Circuit upheld release-dismissal agreements signed by one individual charged with forcibly resisting, obstructing, or interfering with a law enforcement officer, and a second person charged simply with resisting law enforcement. *Gonzales*, 314 F.3d at 314, 320. In so holding, the court noted that "avoiding a potentially costly and lengthy trial over relatively minor matters, with a settlement that was acceptable to both sides, was certainly a legitimate goal related to [the prosecutor's duties]." *Id.* at 320. In this case, the charges against Thompson are even more minor, as there is no charge of forcible resist. Nothing about these circumstances suggests overreaching on the part of the prosecutor.

### 3. Enforcement of this agreement will not adversely affect any relevant public interest.

The two primary public interests implicated in the enforcement of release-dismissal agreements are the public's interest in the proper and uniform enforcement of criminal law and its interest in seeing episodes of police misconduct adequately addressed. *Id.* at 320. There is no evidence that either of these interests is jeopardized by the agreement at issue. As explained

above, bringing the charges and agreeing to the release-dismissal deal were both examples of proper prosecutorial conduct. Prosecutors were acting within their discretion in determining both that the criminal charges against Thompson and the possible civil liability faced by the officers could be compromised without harm to the public interest. Notably, Plaintiff waited more than eighteen months after the charges were dismissed before filing this lawsuit; the statute of limitations on the misdemeanor charges he faced has now run. *See* 720 ILCS 5/3-5(b). In challenging the enforcement of the release-dismissal agreement, Plaintiff seeks to claim the benefits of proceeding with his civil rights action, while denying the public's interest in the uniform enforcement of criminal law.

As the courts recognize, there is a public interest in ensuring that police misconduct is appropriate redressed. In determining whether enforcement of a release-dismissal agreement would adversely affect that interest, the *Gonzalez* court considered what the plaintiffs had received in return for relinquishing their rights to sue. *Id.* at 320-21. The court viewed the dismissal of the criminal charges and the saved time and expense involved in a criminal trial as at least a mitigating factor in the determination of whether the public interest was served. *Id. Rumery*, similarly, observed that there are circumstances under which "the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action." *Rumery*, 480 U.S. at 394. The *Rumery* Court's primary concern was, of course, the possibility that misuse of the prosecutorial function would be used to suppress valid § 1983 claims. *Id.* at 394-95. This court is not troubled by that possibility in the context of this case, where, if there were any coercion to be found it has its origin with Aronson, Thompson's defense attorney. Thompson has not identified any opportunity for prosecutorial coercion.

While there is no bright-line rule concerning the propriety of enforcement of a release-dismissal agreement, the court is satisfied that enforcement of the agreement at issue here is not inconsistent with the public interest.

**CONCLUSION**

Defendants' motion for summary judgment [32] is granted.

ENTER:

Dated: March 4, 2011

_____
REBECCA R. PALLMEYER
United States District Judge